UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CENTURY BUSINESS SERVICES, INC. and SR BUSINESS SERVICES, INC. | ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:01-CV-02166 |
| | | Judge Ann Aldrich |
| Plaintiffs, | | |
| v. | | |
| | | MEMORANDUM OF OPINION AND JUDGMENT ORDER |
| KENNETH W. BRYANT | | |
| Defendant. | | |

This court held a bench trial on plaintiffs Century Business Services, Inc.'s, now known as CBIZ, ("CBIZ"), and SR Business Services, Inc's. ("SRB") (collectively "plaintiffs") complaint against defendant Kenneth W. Bryant ("Bryant") for breach of contract and violation of the Lanham Act. Specifically, plaintiffs seek damages on counts 1, 2, and 6 of the amended complaint [dkt. 50].[1] For the following reasons, the court find for plaintiffs on counts 1, 2, and 6.

**I.  FACTUAL FINDINGS**

Plaintiff Century Business Services, Inc. ("CBIZ") provides business services to small companies throughout the United States. These business services include accounting, payroll, employee benefits, insurances, tax, consulting, IT, and human resources. [Tr. 54, ln. 17-24]. CBIZ buys other professional service companies and integrates them into its system. In 1997, CBIZ purchased the Atlanta-based accounting firm Smith & Radigan P.C. for $6 million. As part of the purchase, CBIZ acquired all of Smith & Radigan P.C.'s assets, and the former owners became executive employees of the new CBIZ owned entity. The new CBIZ entity that emerged is the

---

[1] Plaintiffs waived the remaining counts in the amended complaint [dkt. 102, at 21].

second plaintiff, SR Business Services, Inc. ("SRB"). [Plaintiffs Exhibit 1].

Defendant Kenneth W. Bryant ("Bryant") was a former owner of Smith & Radigan P.C. and became an executive employee at SRB. [Plaintiffs' Exhibit 3]. The former owners of Smith & Radigan P.C., Bryant included, received substantial amounts of cash and stocks as part of the merger with CBIZ. [Plaintiffs' Exhibit 1]. Initially, Bryant received stock valued at $566,667 at closing, and an earnout payment of $283,333. [Plaintiffs Exhibit 1; Tr. 119, ln. 12-24]. He also received $160,000 in cash as part of the merger transaction. [Tr. 120, ln. 3-5]. As a result of the Executive Employment Agreement, Bryant also received a salary of $240,000 from SRB, and the title of Vice President.

The merger of Smith & Radigan P.C. and CBIZ took between two and three months, and included numerous exchanges of drafts. [November 10, 2008 Tr. 8, ln. 13-17]. All parties were represented by counsel. [Plaintiffs' Exhibit 1]. The merger was completed on December 4, 1997 with the execution of the Agreement and Plan of Merger ("Merger Agreement," Plaintiffs' Exhibit 1) and the Executive Employment Agreement ("Employment Agreement," Plaintiffs' Exhibit 3). Bryant, along with four other owners of Smith & Radigan P.C. - Pace Palaio, John Smith, Scott Thurman, and Time Radigan - signed the merger agreement.

At trial, Bryant testified about his entering into the merger agreement contract:

> Q: Back when you signed this, and even prior to it, you had a chance to review the document before you signed it, did you not?
> A: Yes.
> Q: And when you signed the agreement, the merger agreement, you understood what you were agreeing to, didn't you?
> A: Yes.
> Q: When you signed the merger agreement you agreed to be bound by the terms and conditions in here, correct?
> A: Yes.
> Q: And when you signed the merger agreement your partnership, Smith & Radigan, was represented by counsel, was it not?

> A: I believe so, yes.
> Q: And counsel was the law firm of Alston & Bird in Atlanta, correct?
> A: Yes.
> Q: And the lawyer there named Steven Pottle, P-O-T-T-L-E, represented you and the partners of S and R, correct?
> A: Yes.
> Q: Now, when you signed the agreement you were in favor of this deal, were you not?
> A: Yes.
> Q: And you dont' recall any concerns prior to the deal being finalized, do you?
> A: No.
> Q: And just so I'm clear, as part of your defense in this case you are not contending that CBIZ breached the merger agreement in any way, are you?
> A: No.

[Tr. 117, ln.2-25; Tr. 118, ln. 1-7].

On the same day, and as a requirement of the merger agreement, Bryant also signed the employment agreement, which contains a non-compete clause. [Plaintiffs' Exhibit 3]. Bryant similarly testified that he reviewed and understood the employment agreement. [Tr. 131, ln. 12-25; Tr. 132, ln. 1-5]. Also on December 4, 1997, Smith & Radigan, L.L.C., signed the Administrative Services Agreement with SRB.

CBIZ's acquisition of accounting firms required complicated structured transactions in order to comply with state laws that prohibit certified public accounting ("CPA") firms from being owned by non-CPA's. Consequently, the Smith & Radigan P.C. was first merged into a CBIZ-owned subsidiary, and the former owners, who are CPA's, become contract employees of a new entity. [Plaintiffs' Exhibit 1]. As a requirement of the merger agreement, the former owners then formed an independent CPA firm, Smith & Radigan, CPA, L.L.C. (also known as "SR Accounting"), which they own and through which they perform "attest" functions, which are audits, reviews, or opinion reports. As another requirement of the merger agreement, Smith & Radigan L.L.C. would enter into an Administrative Services Agreement [Plaintiffs' Exhibit 4] with the CBIZ-owned subsidiary SRB,

-3-

which would provide all of the "non-attest" work for a fee. Non-attest work is all of the labor and preparation of reports before the "attest" work. SRB provides support and labor to Smith & Radigan L.L.C. up to the point of attestation. This includes accounting labor, bookkeeping and internal accounting staff, marketing, office space, and equipment and related support. [Plaintiffs' Exhibit 4]. As a result of the merger, Bryant became an employee of SRB and a partner at Smith & Radigan, L.L.C. [Tr. 130, ln. 20-23].

When asked to explain the relationship between SRB and Smith & Radigan L.L.C. as provided for in the Administrative Services Agreement, Michael Gleespen, CBIZ's general counsel, testified as follows:

> Well, the document sets out generally what services each entity will be responsible for. Again, the attest work is the business of the associated CPA firm. And labor on the attest work is to be provided, along with many other services, such as the invoicing, bookkeeping, receptionists' time and nonprofessional staff members' time, as well, office space, IT services, basically the entire business operation as provided by SRB, and with certain exceptions, most of the employees, as well, and those employees then work on attest work of the CPA firm in exchange for a certain percentage. Under the agreement, it was 85% of invoice billings.

[Tr. 69, ln. 5-16].

Thus structured, the transaction is in compliance with Georgia law requiring that only a CPA firm can provide "attest" services. The American Institute of CPA's has adopted such an arraignment, and the Georgia Board of Accountancy has approved similar structures, and the structure used by SRB and Smith & Radigan L.L.C. [Tr. 56, ln. 24-25; Tr. 59, ln. 7-12; Plaintiffs' Exhibit 5].

While at SRB, Bryant worked with Christine Allen, who was an audit manager, and who had worked at Smith & Radigan, P.C., now SRB, since 1992.[2] Bryant worked most with Allen on clients

---

[2] Allen's last name changed to Carter, following a divorce in July 2002. [Tr. 176, ln. 19].

such as Security Properties, Inc. ("SPI").. On August 30th, 2001, Bryant formally resigned from SRB; Allen resigned on August 28, 2001. Bryant's post resignation actions, as described below, form the basis for the breach of contract and Lanham Act violations.

The "Agreement and Plan of Merger" and the "Executive Employment Agreement" are governed by Ohio law and provide that jurisdiction and venue over disputes shall be in Ohio. [Merger Agreement § 10.7; Executive Employee Agreement § 16].

## II.  LAW AND ANALYSIS

### A.  Count 1: Breach of Agreement and Plan of Merger

As discussed above, Bryant entered into the Agreement and Plan of Merger contract with SR Business Services, Inc. that included, among other things, a noninterference clause. The noninterference clause prohibited Bryant from soliciting, attempting to solicit, inducing, attempting to induce, cause or facilitate any employee to terminate or change her employment or services to CBIZ. Paragraph 7.7 of the Agreement and Plan of Merger, provides, in part:

> **Noninterference**. Each of the Shareholders, severally, agrees that he will not at any time without the prior written consent of IASI, either directly or indirectly (i) solicit (or attempt to solicit), induce (or attempt to induce), cause or facilitate any employee, director, agent, consultant, independent contractor, representative or associate of IASI or IASI subsidiaries and affiliates (collectively, the IASI Group) to terminate or change his, her or its employment or services to, or relationship with the IASI Group[3] . . . .

[Plaintiff's Exhibit 1, at 32; Dkt. 1, Exhibit A].[4]

Count 1 of the amended complaint alleges that "Bryant has violated this obligation in the Agreement and Plan of Merger" contract by "soliciting and/or inducing a CBIZ employee to leave

---

[3] International Alliance Services, Inc. ("IASI") is a parent company of CBIZ.

[4] The Executive Employment Agreement also contains a materially similar "Nonsolicitation" clause. *See* Plaintiffs' Exhibit 3, at 4 (¶ 7).

CBIZ and to join his competing business." [Dkt. 50, at 7]. Specifically, plaintiffs argue that Bryant solicited SRB employee Christine Allen to leave SRB and work with him to service SRB clients, including SPI. [Dkt. 118, at 1]. Bryant argued in his briefs and at trial that he never solicited Allen to leave SRB. However, the facts, as established at trial, belie Bryant's claims.

Under Ohio law, to prove breach of contract, a plaintiff must prove that: (1) a contract existed; (2) plaintiff fulfilled his obligations; (3) defendant failed to fulfill his obligations; and (4) damages resulted from this failure. *Lawrence v. Lorain County Cmty Coll.*, 713 N.E.2d 478, 480 (Ohio Ct. App. 1998). Here, the first two elements are not disputed.

At trial, the court heard testimony about the professional and personal relationships between Bryant and Allen and their work together before and after their resignations from SRB.

Allen had worked for Smith & Radigan, P.C., since 1992, and continued working for SRB following the merger. One of the people Bryant work with the most was Allen. [Tr. 133, ln. 19-25]. Specifically, Allen worked "almost exclusively for Ken Bryant on the attest – on the HUD clients," which included SPI and AIMCO. [Tr. 41, ln. 16-22].

Conflicting testimony was given as to whether Bryant and Allen had any conversation about her leaving SRB. On direct examination for Bryant, Allen testified that Bryant never, in any way, solicited her to leave the employment of SRB. [Tr. 178, ln. 2-17]. Similarly, Bryant testified on direct that he did not have any conversations with Allen about her leaving SRB. [Tr. 233-34]. When asked about a conversation he had with Palaio following his resignation in late August 2001, Bryant recalled the following:

> I told him that I was leaving to do the audit work, was only going to do audits, and that wasn't really competing. Also, he asked me about Christine Allen and what she was going to do, and my comment to him was, I said, I would think she would follow me, which I meant I have not said anything to her, but I would not solicit her and she will follow me. She ended up doing it on her own, and not with me.

[Tr. 233, ln. 12-19]

However, Palaio recalls a very different conversation with Bryant:

> Q: Did you have a discussion directly with Mr. Bryant at or about the time that he decided to leave the firm?
> A: Yes. The next day I went into Ken's office and asked him if it was true, and he indicated that it was.
> At the time I was surprised, and I pointed out to him that, you know, we were subject to these agreements. And he had indicated that he had consulted with an attorney, and didn't feel like the noncompete agreement complied.
> Further, I went on and pointed out – he indicated – at that time he indicated he was going to take Christine, that she was going to work with him on what we called the HUD jobs. And I pointed out that the agreement prevented that, and he was surprised at that. He seemed genuinely surprised.
> Q: You said Christine. Christine whom?
> A: Christine Allen. I'm sorry. She was an audit manager that worked almost exclusively with Ken.
> Q: So he told you that he was going to take her with him once he left?
> A: Yes, he did.

[Tr. 37 ln. 12 through Tr. 38 ln. 6].

Similarly, on direct examination of Gleespen, he gave a different account than that of Bryant:

> Q: Did you talk to Mr. Bryant on or about August 30th of 2001?
> A: Yes, I did.
> Q: Do you recall what the conversation was about?
> A: Yes, I do.
> Q: Tell the Court.
> A: We had a phone call. In attendance were Mr. Thurman, I believe, Mr. Palaio, and Mr. Bryant. . . .
> [hearsay objections, which the court overruled]
> A: I indicated to Mr. Bryant that it had come to my attention that he was calling clients with the intention of taking them away from the firm, and I asked him if that was true, and he said that it was. I said, do you understand that that is in violation of your agreement with us? And he said he did. I also asked him was it his intention to take any staff members with him, and he indicated that it was his intention to take Miss Allen with him.
> Q: Christine Allen?
> A: Right.

[Tr. 71, ln 24 through Tr. 73, ln. 15].

Finally, Allen, on cross-examination testified that she and Bryant had not discussed the possibility of working together. Yet, her deposition gave a slightly different answer, which

-7-

plaintiffs' counsel had her read into the record:

> "Q: Did you discuss the possibility of going to work with Ken?
> A: No.
> Q: That never came up?
> A: To work with him?
> Q: Yes, ma'am.
> A: Maybe it did, but again, there was a deal, who knew what I could do."

[Tr. 185, ln. 13-20].

Then, on August 28, 2001, within days of Bryant's resignation from SRB,[5] Allen also resigned. [Tr. 188, ln. 2-3]. Following her resignation, she started her own company, SR Allen. She used the designation "SR" to imply affiliation with Smith & Radigan. [Tr. 188, ln. 7-9, 12-15]. Similarly, following his resignation, Bryant formed S&R Consulting. [Tr. 150 ln. 4-6]. Shortly after their resignations, both Bryant and Allen leased office space directly next to each other, such that there offices shared a wall. [Tr. 135, ln. 12-22]. Not only were there offices next to each other, they also hired and shared office staff and interns. [Tr. 136-37]. They also shared former clients of SRB, including SPI. [Tr. 204, ln. 3-7].

The Agreement and Plan of Merger's noninterference clause prohibits actual or attempted soliciting, inducing, causing, or facilitating any employee to terminate or change her employment relationship with SRB. While Bryant was adamant the he never discussed leaving SRB with Allen, the testimony of Gleespen, Palaio, and to a lesser extent Allen, in conjunction with the actions of Bryant and Allen reveal that, at the very least, Bryant facilitated or induced her resignation with SRB so that they could begin their businesses together. The timing of Allen's resignation, in relation to Bryant's, is too close to be merely coincidental. The leasing of office space adjacent to each other such that they could share clients and staff suggests that they shared a common plan or

---

[5]Bryant formally resigned on August 30, 2001, but his resignation was made known to his office at least by August 27, 2001. [Tr. 37, ln. 7].

-8-

intention, regardless of whether the details were finalized, at the time of their resignations.

Further, the long-standing professional relationship between Bryant and Allen demonstrates that they worked well together and that she had detailed working knowledge of Bryant's clients, including SPI and AIMCO. The nature of their relationship gives additional weight and credit to the evidence showing that Bryant facilitated or induced her departure from SRB to start a new business or businesses together. It is improbable that Allen would leave her job with SRB at the same time as Bryant without having some assurances that they would again work together in a new venture.

Accordingly, this court finds that Bryant breached the Agreement and Plan of Merger's noninterference clause by inducing or facilitating Allen's termination of her employment relationship with SRB.

### B. Count 2: Breach of the Executive Employment Agreement

Bryant also entered into the Executive Employment Agreement ("Employment Agreement") with SRB. The Employment Agreement contained a noncompete clause, in which he agreed not to engage in any business in competition with SRB during a two year period following his employment with SRB. Paragraph 6 of the Employment Agreement, provides, in part:

> **Noncompetition**. The Executive agrees that during the period in which the Executive is employed by the Company and for two years thereafter the Executive shall not, without the prior written consent of the IASI representative and the Company, either directly or indirectly, solicit, attempt to solicit, take away, attempt to take away or otherwise interfere with the Company's and IASI's relationship with any customer (including any customer in the Company's or IASI's database), or Qualified Prospective Customer of the Company, or otherwise compete with the Company or IASI with respect to any customer or Qualified Prospective Customer . . . .
>
> During the term of this Agreement and for a period of two years thereafter, the Executive will not, without the IASI representative's and the Company's prior written consent, directly or indirectly

> engage in, make any investment in or have any interest in any business in competition with the business of the Company or IASI; and the Executive will not advise, assist or render services or refer customers, either directly or indirectly, to any person, firm, company, corporation or business (other than the Company or IASI) with reference to any business in competition with the business engaged in by the Company or IASI during the Executive's employment by the Company . . . .

[Plaintiff's Exhibit 3, at 3]

Count 2 of the amended complaint alleges that Bryant "violated these obligations by forming a competing business and soliciting CBIZ customers to move their business from CBIZ to his new business." [Dkt. 50, at 8]. Bryant argues that his post-resignation work never directly competed with SRB.

As with Count 1, under Ohio law, to prove breach of contract, a plaintiff must prove that: (1) a contract existed; (2) plaintiff fulfilled his obligations; (3) defendant failed to fulfill his obligations; and (4) damages resulted from this failure. *Lawrence*, 713 N.E.2d at 480. Here, the first two elements are not disputed, and the reasonableness of the noncompete clause is not disputed.

At trial, Bryant admitted that he did solicited SPI to leave CBIZ and that he did their attest work after his resignation from SRB:

> Q: Did you do any of the labor on the attest engagements for SPI after you left CBIZ?
> A: I did.
> Q: You solicited SPI to go with you after you left CBIZ, correct?
> A: I – yes.
> Q: You called Roy Lee at SPI and told him that you no longer worked at SR Business Services, didn't you?
> A: I had a discussion with Roy Lee.
> Q: And that was within two years of your departure from SR Business Services, correct?
> A: That is correct.

[Tr. 142, ln. 13-24]

Allen also admitted doing work for SPI:

> Q: Following your resignation in August of 2001 you did work for SPI, correct?
> A: Yes.

[Tr. 194, ln. 8-10].

Similarly, when asked about his August 30, 2001 conversation with Bryant, Gleespen testified of Bryant's intention to take clients away from SRB. The testimony, provided in the previous section, is worth repeating:

> I indicated to Mr. Bryant that it had come to my attention that he was calling clients with the intention of taking them away from the firm, and I asked him if that was true, and he said that it was. I said, do you understand that that is in violation of your agreement with us? And he said he did. I also asked him was it his intention to take any staff members with him, and he indicated that it was his intention to take Miss Allen with him.

[Tr. 73, ln. 5-10].

Indeed, after Bryant and Allen resigned, SPI and AIMCO ceased being clients of SRB. Palaio testified about the loss of business:

> Q: Following the resignation of Mr. Bryant and Ms. Allen from SR Business Services, did SR Business Services continue to service AIMCO and SPI as they had in the past?
> A: No. We --
> [Objection, which the court overruled]
> Q: And the answer was?
> A: We did not. We did not have the business anymore.

[Tr. 41, ln. 23 through tr. 42 ln. 16].

Prior to Bryant's resignation, SPI was generating revenues for both SRB and Smith & Radigan, L.L.C. [Tr. 143, ln. 21-24]. After Bryant left SRB, he testified that "we had the interns" and a couple other individuals do the labor on the attest engagements for SPI. [Tr. 142, ln. 9-12]. Allen, herself, also did some of the labor work for SPI. [Tr. 192, ln. 6-9, Tr. 194, ln. 8-10]. Bryant then paid SR Allen for the labor on the attest work. [Tr. 139, ln. 14-16] and also wrote a check to reimburse the payroll for SR Allen employees. [Tr. 163, ln. 12-21]. Bryant also referred tax clients to Allen during the two year period following their resignations from SRB. [Tr. 199, ln. 5-10].

-11-

Bryant argues, however, that he was not competing with SRB, or otherwise in breach of the Employment Agreement. Essentially, the entire defense is that the business engagements were between SPI or AIMCO and Smith & Radigan, L.L.C., and not SRB. [Tr. 42, ln. 20-25]. SPI "never had an engagement letter for attest services with SR Business Services, Inc." [Dkt. 119, at 4]. "[I]n this case, the restrictive covenant merely states that the employee, Mr. Bryant, cannot compete with SR Business Services, which itself does not provide attest services. Thus, if Mr. Bryant provides attest services by definition from the agreement, he is not in competition with Plaintiff." [Dkt. 119, at 6]. Similarly, throughout the trial, Bryant argued that because he only did attest work, he could not directly compete with SRB, which did non-attest work for Smith & Radigan, L.L.C.

Yet, the Employment Agreement is broader than Bryant's argument assumes. The noncompete clause prohibits Bryant from "directly or indirectly" soliciting, attempting to solicit, "take away, attempt to take away, or otherwise interfere" with SRB's relationship with any customer. [Plaintiffs' Exhibit 3, at 4]. The agreement also prohibits Bryant from referring customers, either directly or indirectly, to any company or individual in competition with SRB. [*Id.*] Bryant is in breach of this agreement.

Bryant took away SPI and, at best, gave or referred the non-attest work to SR Allen. At worst, he did the non-attest work himself. Either way, Bryant is in breach of the contract. While SPI may not have had a contractual relationship with SRB, the two entities certainly had a business relationship and, by Bryant's own testimony, SRB received revenue from SPI. [Tr. 143, ln. 21-24]. Bryant's attempt at an overly technical defense is without merit.

Bryant structured his business, S&R Consulting, to work with SR Allen in a way that competed, directly and indirectly, with SRB. The relationship between S&R Consulting and SR Allen, was similar in nature to that of SRB and Smith & Radigan, L.L.C., such that Bryant directly and indirectly competed with SRB and interfered with its relationship with SPI. Bryant's tax

referrals to Allen also clearly violated the terms of the noncompete agreement.

The testimony and evidence is clear that SPI left Smith & Radigan, L.L.C. and SRB, and went to S&R Consulting and SR Allen. Bryant certainly interfered with SRB's business relationship. The breach could not be more clear.

Accordingly, this court finds that Bryant is in breach of the Executive Employment Agreement with SRB.

      **C.**      **Count 6: Violation of the Federal Lanham Act**

Count 6 of plaintiffs amended complaint alleges that Bryant "used the trade name 'SR Consulting' without authorization from CBIZ in interstate commerce in a manner that suggests affiliation, connection, or association with CBIZ" in violation of the Lanham Act.

The Lanham Act, 15 U.S.C. § 1125(a) provides, in part:

> (a) Civil action
>
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .
>
> . . .
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

A trademark is any word, name, symbol, device, or any combination thereof, used by a person or business to identify and distinguish that person or business's goods from those of others and to indicate the source of the goods, even if that source is generally unknown. Trademarks can

-13-

be, but are not required to be, registered with the United States Patent and Trademark Office. *See Two Pesos, Inc. v. Taco Cabana, Inc*., 505 U.S. 763, 769 (1992). Here, SRB and Smith & Radigan have used the initials "SR" or "S&R" to identify and distinguish their services from those of others, and therefore, SRB is the owner of the "SR" or "S&R" trademark.

"The touchstone of liability [for trademark infringement] is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Hansley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 610 (6th Cir. 2009) (quotations and citations omitted). In determining whether a likelihood of confusion exists, a court will typically weigh the following eight factors: (1) strength of the senior mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the intent of defendant in selecting the mark; and (8) likelihood of expansion of the product lines. *Id*. In applying these factors, there is no mathematical precision to the analysis, but the factors function "simply as a guide to help determine whether confusion is likely." *Homeowners Group v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991). Plaintiffs need not show *actual* confusion. *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006).

The strength of a mark is a factual determination of the mark's distinctiveness. *Id*. Here, "S" & "R" stand for Smith & Radigan, the original accounting firm that was acquired by CBIZ, and became SR Business Services, Inc., and Smith & Radigan, L.L.C. Thus, through the merger the initials SR were retained as a descriptive mark to show affiliation with the original accounting firm and to show the source of the services. Bryant had been associated with Smith & Radigan for over 20 years, and wanted to continue his association with that firm following his resignation. [Tr. 151, ln. 19-24]. The mark was at least distinctive and strong enough to lead Bryant to attempt to continue his association with his old firm, through the use of the initials "SR."

The relatedness of the goods is determined, in part, by a "tripartite system." *AutoZone, Inc., v. Tandy Corp.*, 373 F.3d 786, 798 (6th Cir. 2004). The Sixth Circuit has explained that:

> If the parties are in direct competition, "confusion is likely if the marks are sufficiently similar." If the goods are "somewhat related, but not competitive," the likelihood of confusion determination will turn on one of the other seven factors. Id. If the products are unrelated, a likelihood of confusion is "highly unlikely." Id. "Services and goods are related not because they coexist in the same broad industry, but are related if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company."

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 516 (6th Cir. 2007) (internal citations omitted). Here, Bryant's new company, S&R Consulting, L.L.C., is in direct competition with SR Business Services and Smith & Radigan, L.L.C. Accordingly, consumers may believe that the services, similarly marked by "SR" come from the same source, or are somehow connected to the same company.

As previously discussed the similarity of the marks is substantial. Indeed, Bryant intended such similarity. Thus, the third and seventh factor (intent of defendant) are considered with Bryant's testimony in mind. On cross-examination, Bryant testified:

> Q: Now. Following your departure in August of 2001 you formed S&R Consulting, L.L.C., correct?
> A: That is correct.

[Trans. Pg. 150, ln. 4-6]

> Q: Did you have a purpose for calling your firm S&R Consulting?
> A: Not really.
> Q: Do you recall testifying about that in your deposition?
> A: I believe that I might have said something that it was – that I had been identified with Smith & Radigan for a long time and that I used that.
> Q: Okay. And the S stands for Smith and the R stands for Radigan, correct?
> A: Nope.

[Trans. Pg. 150 ln. 24 through pg. 151 ln. 9].

-15-

Bryant's responses at trial that "S" and "R" are unrelated to Smith and Radigan, at best, strain credulity. Indeed, the next line of questioning, plaintiff's counsel seeks to impeach Bryant's testimony:

> Q: Well, do you recall when I took -- when Mr. Morelli took your deposition, correct?
> A: I remember having a deposition.
> . . .
> Q: The question is, "What did the S and R stand for?" and your answer was, "Could be Smith and Radigan. I had associated with Smith & Radigan for 20 years." Then the question was, "was that your purpose in using S&R Consulting, L.L.C.?" And the answer was, "That was my purpose, yes." [. . .]

[Trans. pg. 151, ln. 10-24]

The intent of the defendant is important because "purposeful copying indicates that the alleged infringer . . . believes that his copying may divert some business from the senior user." *Daddy's Junky Music Stores, Inc., v. Big Daddy's Family Music Center*, 109 F.3d 275, 286 (6th Cir. 1997). Here, Bryant clearly selected S&R Consulting, L.L.C. as a business name to derive benefit from his past association with Smith & Radigan and SRB.

However, when it comes to evidence of actual confusion, the plaintiffs have little to offer. "Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *AutoZone, Inc.*, 373 F.3d at 798. At trial, Palaio provided limited testimony that, after Bryant's resignation, SRB had received phone calls from potentially confused customers and that he instructed the receptionist to be inquisitive as to whether the matter should be referred to Bryant. [Tr. 43, ln. 12-25]. Further, it appears that invoices sent on "S&R Consulting, L.L.C." letterhead were limited to one client - SPI. [Tr. 153, ln. 1-22]. Yet, plaintiffs need not show *actual* confusion to prevail on their Lanham Act claim.

There is no evidence on record as to any marketing that Bryant did while doing business as S&R Consulting. Similarly, there is no evidence regarding the sixth factor, "likely degree of

-16-

purchaser care."

Finally, there is no evidence of likelihood of expansion of the product line for SRB, and Bryant ceased doing business as "S&R Consulting."

Here, Bryant's intentional use of the "SR" mark was to benefit from his affiliation with SRB and Smith & Radigan, L.L.C. Because Bryant was directly competing with his SRB and Smith & Radigan, L.L.C., the services are very closely related, perhaps even identical in some circumstances. Bryant's claim that he used "S&R Consulting" for less than a year, has since stopped, and only sent invoices on "S&R Consulting" letterhead is not relevant for purposes of determining the "touchstone of liability," which is the likelihood of confusion among customers. Even sophisticate business consumers could easily associate "S&R Consulting" with SR Accounting, SR Business Services, or Smith & Radigan. Indeed, the association was Bryant's very intention. The likelihood of confusion, therefore, was substantial.

Accordingly, the court finds for plaintiff on count 6 of their amended complaint.

### D. Damages

#### 1. Counts 1 & 2

Paragraph 11(b) of the Executive Employment contract provides for liquidated damages:

> **Liquidated Damages.** The Executive acknowledges and agrees that in the event of any breach by the Executive of any of the covenants contained in this Agreement, the actual dollar loss to the Company and/or IASI would be impossible to calculate. Therefore, the Executive agrees that, in addition to any equitable remedy available to the Company and/or IASI, in the event any earnings, commissions, payments or fees (including, without limitation, any override commissions or expense allowances) become payable to the Executive or to any other person, firm or entity with which the Executive is affiliated in any capacity, as a result of a violation by the Executive of any of the covenants contained in this Agreement, the Executive shall pay to the Company and/or IASI, or shall cause the person, firm or entity with which Executive is affiliated to pay to the Company and/or IASI, an amount equal to one hundred percent (100%) of such earnings, commissions, payments or fees (including,

    without limitation, any override commissions or expense allowances)
    as liquidated monetary damages.
[Plaintiffs' Exhibit 3, at 6].

Pursuant to the above clause, plaintiffs request that, while they are entitled to 100% of gross revenues, the court award them 85% of the gross revenues that Bryant collected during the two-year period following his breach. The 85% represents the revenues to which SRB would have been entitled to under the terms of the Administrative Services Agreement.

Bryant argues that the liquidated damages clause is an unenforceable penalty clause.

"Whether a stipulated amount in a damages clause constitutes liquidated damages or should be considered as a penalty is a question of law for the court to decide." *Lake Ridge Academy v. Carney*, 66 Ohio St. 3d 376, 380 (1993). Both parties cite to *Samson Sales, Inc. v. Honeywell, Inc.*, 12 Ohio St. 3d 27, 28 (1984) for the test for the validity of a liquidated damages clause. In Ohio, "where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages should be (i) uncertain as to amount and difficulty of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof." *Id*.

Here, the parties agreed in the contract that the actual dollar loss to plaintiffs would be "impossible to calculate." It is uncertain how much business revenue Bryant would have continued to generate for SRB over the two year period. Accordingly, the court finds that the damages would otherwise be uncertain, indeed speculative, and very difficult to prove.

As for the second prong, Bryant was represented by competent counsel when he signed the

-18-

contract and is himself a sophisticated individual. Moreover, Bryant received considerable consideration - hundreds of thousands of dollars - in agreeing to sign the contract. Additionally, as a result of his breach, the SRB lost significant amounts of revenue and had to terminate five professional employees and one administrative staff employee. [Nov. 10, 2008 Tr. 38, ln. 14-25]. Accordingly, the are no grounds to find the liquidated damages clause unconscionable, unreasonable, or disproportionate.

The third prong looks to the actual intent of the parties. Again, Bryant is a sophisticated individual who was represented by counsel. Accordingly, there are no grounds to find that Bryant's intentions were other than those in the contract. Further, many of Bryant's arguments about intent have been addressed by plaintiffs' demand for only 85% of gross revenues.

Bryant provided plaintiffs, in response to a discovery request, with a document detailing the fees billed and collected from August 30, 2001 through August 30, 2003. Bryant generated a total of $1,575,831.85 in the two years from the date he breached the contract. As plaintiffs would have received 85% of that number, the court hereby awards plaintiffs the amount of $1,339,457 pursuant to the liquidated damages clause in the Executive Employment Agreement.

### 2. Lanham Act

Plaintiffs request $25,000 in damages for violation of the Lanham Act. Bryant argues that his use was *de minimus* and caused no actual damage. Title 15 U.S.C. § 1117 provides that damages may be awarded to recover (1) defendant's profits; (2) any damages sustained by the plaintiff; and (3) the costs of the action. Any damages sustained by plaintiff as a result of Bryant's violation of the Lanham Act should be reflected in Bryant's revenue for the two years following his resignation. As the court has already awarded damages in the about of 85% of Bryant's revenue, the court

-19-

declines to award damages for Bryant's Lanham Act violation.

### 3. Attorneys Fees

Finally, the court finds that an award of attorneys fees to the plaintiffs is appropriate pursuant to section 9.2 of the Merger Agreement. Within two weeks of the date of this order, plaintiffs shall file with this court an application for attorneys fees and costs that shall include an affidavit detailing (a) the amount of time spent litigating this matter before this court, and (b) the lodestar rate for the type of legal work performed in this case in this particular geographic area.

### III. CONCLUSION

For the foregoing reasons, the court finds for CBIZ and SRB on counts 1, 2 and 6. Bryant shall pay damages in the amount of $1,339,457 for counts 1 and 2. This order is final and appealable.

IT IS SO ORDERED.

      /s/*Ann Aldrich*
ANN ALDRICH
UNITED STATES DISTRICT JUDGE

**Dated: March 31, 2010**

declines to award damages for Bryant's Lanham Act violation.

### 3. Attorneys Fees

Finally, the court finds that an award of attorneys fees to the plaintiffs is appropriate pursuant to section 9.2 of the Merger Agreement. Within two weeks of the date of this order, plaintiffs shall file with this court an application for attorneys fees and costs that shall include an affidavit detailing (a) the amount of time spent litigating this matter before this court, and (b) the lodestar rate for the type of legal work performed in this case in this particular geographic area.

### III. CONCLUSION

For the foregoing reasons, the court finds for CBIZ and SRB on counts 1, 2 and 6. Bryant shall pay damages in the amount of $1,339,457 for counts 1 and 2. This order is final and appealable.

IT IS SO ORDERED.

/s/*Ann Aldrich*
ANN ALDRICH
UNITED STATES DISTRICT JUDGE

**Dated: March 31, 2010**